We will hear argument first this morning in case 24-109, Louisiana v. Callais, and the consolidated case. Mr. Awigina. Thank you, Mr. Chief Justice, and may it please the court. Louisiana would rather not be here. We didn't want to be in the emergency docket in 2022. We didn't want to be on the emergency docket in 2024. And today, I mean, God bless my friends on both sides of this case, but we'd rather not be caught between two parties with diametrically opposed visions of what our congressional map should look like. But this has become life as usual for the states under this court's voting cases. And our fundamental question today is how do we get out of this predicament? Now, I think there are at least three ways to do that. First, you should reverse on standing grounds, because the only theory of harm in the red brief is that our black representative of District 6 will play into racial stereotypes by favoring the black voters of District 6. Second, you should reverse on racial predominance, because the district court wrongly assumed that our intentional creation of a majority black district in light of the Robinson decisions automatically established racial predominance. And third, you should reverse on the good reasons inquiry, because the district court wrongly, in our view, believed that the Robinson decisions played no role in the strong basis in evidence inquiry. And in the end, I want to emphasize that the larger picture here is important, because in an election year, we face the prospect of a federal court drawn map that placed in jeopardy the Speaker of the House, the House Majority Leader, and our representative on the Appropriations Committee. And so in light of those facts, we made the politically rational decision. We drew our own map to protect them. This court's breathing room precedents allow that decision. I welcome the court's questions. So as I understand your argument, we are to accept that the courts, the Robinson court, require that there be two districts, and that your only interest is in preserving two incumbents in northeast Louisiana. That's correct, Your Honor. I mean, we have two Article III court decisions that say the VRA likely requires Louisiana to draw a second-majority black district. Those were the facts presented to us. In light of those decisions, we said, well, we can't allow the federal court to draw the Robinson illustrative maps, because that would have placed Julia Letlow in a majority Democrat district. And so we took matters into our own hands and said, we're going to protect our most high-profile incumbents, draw our own map that ensures that Speaker Johnson and Representative Letlow remain in Congress. So in order for us to use that line, wouldn't we have to accept that the district court was right, the Robinson court was correct? Your Honor, I think the way this case has been litigated, the way it comes to the court, the plaintiffs have not put on a pseudo-VRA case to say that the Robinson courts were wrongly decided. I mean, of course, as you know, in the Robinson litigation, we took the position that we should have prevailed. We lost. We lost on those arguments. And at the end of the day, I think in the strict scrutiny analysis that this court's case has set out, the question is, do we have a good reason in relying on what the federal courts told us that the VRA likely required? And I think that's the fundamental error. If you look at pages 53A to 66A of our JS appendix, that's the district court's good reasons analysis. It says not one word about the Robinson decisions. And with all respect to the district court, I think that's not how the good reasons inquiry runs. I mean, I think fundamentally, when you have Article III courts telling you that this is what the VRA likely requires, a rational state is going to run with exactly what the federal court says. We're in the business of complying with federal court decisions. And when they told us that we needed to draw a second-majority black district, that's what we did. And I want to go back to the larger context because I think that's the important factual backdrop here, which is we're in an election year. It's 2024. The Fifth Circuit, if you look at page 601 of its decision, the Fifth Circuit says you have a few weeks to, now that we have affirmed the district court's likelihood of success in the merits finding, you have two weeks, a few weeks, to go back, consider drawing your own map. And it's an election year. We're talking about the Speaker of the House. No rational state gambles with those high-stakes seats in that situation. And our request to this court is to say, well, given that unique circumstance, where you have two layers of Article III courts telling a state what the VRA likely requires, that is a good reason for the state to do what it did. Well, I mean, do you think the Robinson court was correct? Your Honor, you know, in our heart of hearts, we've never shied away from our position in the Robinson decisions, which is that we should have prevailed. At the end of that litigation in the preliminary injunction stage, we lost, and so we faced a choice. Do we take a gamble and go to trial, lose at final judgment, endure a court-drawn map, and hope that an appellate court will then step in on the back end of the process and save us from the federal court-drawn map? Or do we say if the court said what they said, what the VRA likely requires, can we work with that and find a way to save our incumbents on our own? And so, Your Honor, you know, I'm not going to stand here and say that the Robinson courts were right, but I will say that what is set in stone is what they said. That is the law, and we took that as gospel and went back to the drawing board and drew District 6. One of the arguments that the appellees raise is that there's a durational limit on the authority of Section 2 to force states to create additional majority-minority districts. I think that's pages 36 to 38 of the appellee's brief. I know that the state of Louisiana in separate litigation is taking exactly that same position as I understood it and read it, and I'm wondering what you think we should do with the appellee's argument about the durational limit here. Sure. A couple of things, Justice Kavanaugh. The first thing I think you do is you disregard it because until the red brief, plaintiffs in this case never disputed this court's assumption that compliance with the VRA is a compelling interest. So I think that part of the brief where they talk about what we're arguing in another case, that's really beside the point here because they forfeited that compelling interest argument. But on the merits, absolutely. In the Naring case, our position is that in Louisiana, at least as applied to Louisiana, Section 2 is unconstitutional. The reality today is we've lost that argument so far, and we are duty-bound to comply with the VRA, and especially in this context where you have federal court decisions telling us what the VRA likely requires. I don't think there's any serious argument that that is not a compelling interest, that we do not have a compelling interest in complying with what the federal courts have told us. And that separate litigation is now in the Fifth Circuit. Is that correct? It's in the Fifth Circuit. In the Naring case, the Fifth Circuit panel heard oral argument in January. That issue may well be before this court. The ultimate unconstitutionality issue may well be before this court this fall. But at least as things stand now, we're duty-bound to comply with the Voting Rights Act. And when a district court and a panel in the Fifth Circuit say the Voting Rights Act likely requires you to adopt a second-majority black district, we're going to do that, Justice Kavanaugh. What if the Robinson decision were plainly wrong, but say it didn't apply Gingles at all? Would you still have a good reason to follow it? No, Justice Alito, and I think that goes to, I know the United States withdrew its brief in this case, but I think that's the sort of unusual circumstance that provides a very, very narrow exception to our position, which is you can imagine an extreme case where the VRA courts just wildly got the law wrong, got the facts wrong, and as an objective matter, nobody would agree that that was a circumstance where a state could reasonably rely on those decisions. What if it weren't wildly wrong? They didn't just ignore Gingles, but it's wrong. You look at it, and it's wrong. They misapplied something. And, Your Honor, I think that the less wildly wrong the decision becomes, I think the harder it is for a plaintiff like plaintiffs in this case to come in on the back end in an Equal Protection Clause case and say we should just re-litigate what happened in the VRA litigation all over again. And that didn't happen in this case. I mean, nothing prohibited plaintiffs from coming to the district court and putting in all the evidence to say, like, if you actually look at what was in the record in Robinson, flat wrong, you should just re-litigate what happened in the Middle District and the Fifth Circuit. They didn't do that. I think that option is available to plaintiffs in a future case. You're saying in this case they didn't argue Robinson was wrong. They didn't put in any evidence to re-litigate the Robinson issue. Justice Sotomayor, they did not put on the full panoply of evidence that was in the Robinson litigation. They say you bear that burden. Your Honor, our burden was to show that we had a good reason for enacting District 6. And our position is that you have two article pre-court decisions that go through the Robinson plaintiff's likelihood of success on the merits. That itself is based on the evidentiary record in the Robinson litigation, almost 400 docket entries in the district court in the Middle District. I'm taking a step back, okay? If they had said that Robinson was wildly wrong, they would have re-litigated in front of the district court based on the very voluminous district court decision. It was over 150 pages filled with the arguments on both sides, right? That's exactly right, Your Honor. What they came in and said was, merely because you were trying to comply with Robinson, that showed you let race predominate, correct? That's correct, Justice Sotomayor. So their approach wasn't saying re-litigate Robinson. They're just saying that's not a compelling state interest. That's correct, Justice Sotomayor. And our position here is that can't be right. I mean, this court has never seen a set of circumstances where you have federal courts telling a state, this is what the law likely requires of you. But we do have at least three cases that say you don't have to be right on whether you needed to comply with Title II. You just have to have a good faith basis, correct? That's right, Your Honor. You have a case, for example, you look at a case like Bush v. Vera, a case that says the state doesn't have to draw the precise compact district that a VRA court ordered on. Or you look at a case like Bethune Hill that says a state doesn't have to show that it would have lost at trial, but for its use of race. I mean, that's the sort of breathing room and flexibility that this court's cases bake into the analysis. Now, we have at least three cases that have said, unlike what the district court said here, the district court said that the reason why race predominated is because you decided to comply with Section II, correct? That's correct, Your Honor. And in at least three cases we've said that's not the starting proposition, correct? That's correct, Your Honor. One of them, Bethune Hill. That's correct. This court has said... So, but we have said that once you try to comply with Section II, that the new map you create has to substantially address the likely Section II violation. That's correct, Your Honor. All right. How does the map that you enacted do that? We know the Robinson map was more compact, followed more traditional criteria than the legislature's first created map, okay? So we know that that would have resolved the Section II violation using traditional criteria. One of their arguments here, and one that the district court pointed to, but wait a minute, this map's different, and it doesn't fit all the criteria. So how do we say that that follows our guidance? Mr. Chief Justice, may I present the answer? So, Justice Sotomayor, I think you begin with the Robinson illustrative maps as a baseline, and you ask how closely does the state's enacted map approximate what the Robinson illustrative map looked like and did. And then if it deviates, you ask that substantially addresses question, well, why did the state deviate, and did it deviate so much that the state's map doesn't actually substantially address the baseline violation identified in Robinson? And the reason, the answers to those questions in this case, the only reason we deviated from the Robinson illustrative map is to protect our high-profile incumbents. But both maps created seven voting districts, correct? We have six districts, correct, Your Honor. I'm sorry. Both maps created two majority black districts. Two majorities, but both of them relied on the same district, having the same number of districts. That's correct, Your Honor. And 70% of District 6's, which is, was 70% of the Robinson map, correct, District 6? That's correct, Your Honor. The very core of District 6 is the very core of the Robinson illustrative maps. We have also said very clearly that if two reasons coexist, race and politics, that 50-50 means that race doesn't predominate, correct? That's what this Court's precedents say, Your Honor. Thank you. Thank you, Counsel. Justice Thomas? Justice Alito? Okay. Justice Stabenow? What's the limit on that in terms of your answer, Justice Sotomayor? You know, 50%, 40%, 30%, and what kind of guidance do you think we could give? Because one of the legitimate concerns of your brief and the amicus briefs are to give clearer guidance. What do you think the limit is on taking the political considerations into account in fashioning a remedial district that substantially addresses the violation? Well, I think one of the limits, Justice Kavanaugh, is numerical, right? I mean, in Shaw 2, the Court said that a 20% overlap was insufficient. In LULAC, you know, less than 50% was insufficient. Here, we're in the neighborhood of 70%. So I think as a numerical matter, that's going to be one pretty clear guidepost for the lower courts on how closely a state is approximating the illustrative map. And I think the other thing is just to really assess why the state deviated from the baseline map. And I think that's one of the things where I don't know that there's any dispute in this case on both sides why we didn't adopt SB 4, we adopted SB 8. The sole reason, in Senator Womack's own statements, is SB 8 was the only map that would protect our high-profile income. So the rule I think you want is political considerations are fine to take into account in doing the map, the second map, and 50 is kind of a floor on that? I think so. I mean, this Court has never spelled out what substantially addresses means as a numerical matter. And to my mind, if I'm between 60% and 80%, I think that's substantial, but obviously a judgment call for this Court. Thank you. I just want to be sure I understand your question to Justice Alito. Justice Alito asked you, you know, if the Robinson decision was patently wrong, could it still be a good reason? And you said, well, you know, if it was patently wrong, no, but we were obeying the federal court orders, this wasn't patently wrong. What is the point at which, because it's an odd situation, right, where the later district court has to essentially take as preclusive the earlier district court's determination of the Section 2 violation, right? But it's not entirely preclusive because you left room for the later court to say, well, that was patently wrong, so we're not going to follow it. What is the line? So I think there are two ways in which it's not automatically preclusive, Justice Barrett. I think the first is, regardless of what the earlier court decisions say, when the state acts, it has to substantially address the baseline violation. So that's one way in which, if we fail to do that, if we adopted an SB 8 map that had only 20% overlap with the Robinson illustratives, then that's one way in which the VRA decisions are not preclusive here. We lose this case. I think the other way, and I think this is what your question was getting at, is that in the wildly wrong case, you know, I think we just can't dispute that there may be some case where, objectively, on both sides of the aisle, everybody agrees that the court just got the law on the facts wrong. I think that's a case we have to give up, and we're happy to give it up. But barring that case, when a federal court, two federal courts, tell a state what the law requires, to me, that means that there should be a very, very high bar in this court's precedence for second-guessing what those federal courts say. And I think you just leave that hypothetical out there as a potential odd case that may never arise, but we acknowledge that, you know, it is out there. I mean, is it also because of the position that it puts the state in here? I mean, it's not just a matter of your obedience to the federal court order, which I appreciate. You know, you would be obedient to the federal court order. But it's also that if you had continued to litigate in Robinson, you risked having the court-imposed map. And so it's really your litigation risk that's part of the calculus here? That's one risk, Your Honor. I think it's both litigation risk and political risk. Because remember, if you look at page 601 of the Fifth Circuit's decision, they say, now that we have affirmed the district court on the merits, we don't doubt that the legislature might want to take this opportunity to draw a new map now. And here's the deadline, January 15, 2024. You call that litigation risk, you can call that political risk. Whatever it is, it's forcing the state to make a call. Let's wrap that together, yes. That's correct. If you're going to lose, then you risk that the district court's going to impose a map on you. That's exactly right, Justice Barrett. Okay. Justice Jackson? So can I just clarify, there's no dispute that the court's order was the reason that Louisiana did this, did the new map, right? Mr. Grime can correct me if I'm wrong, but I don't think so, Your Honor. And the question is whether or not the fact that you had a court order was a good enough reason for you to do it? Is that what you understand the basic question to be? That's correct. Not just one order, but two layers of orders, yes, Your Honor. And I guess I'm still a little confused as to why it matters whether the court order was right or not. You were still being compelled by the court to do what you did in this case, correct? That's correct, Justice Jackson. And I guess all I was trying to – the point I was trying to drive home is that you could imagine – and I think that's why the United States Withdrawal Brief calls it an unusual circumstance, where the VRA decisions were just wrong, just plainly wrong, and nobody would rely on them. But this is nowhere close to that. And it may well be that this court never sees a situation where that's sort of wildly irrefutable. But I guess that hypothetical invites us to even engage in a question, an inquiry as to whether or not this was a wildly wrong case. And I'm just worried about that as a way of going about handling this sort of situation. I mean, Justice Barrett points out that we have a prior court order, you say, and it's clear that it was affirmed by the Fifth Circuit that, to a certain extent, it is preclusive on the facts of whether or not there's a likely VRA violation here. And having a likely VRA violation is all that was necessary for the state to take the steps that it did. So I just don't know that we need to even engage in the thought process of what if the court order was wrong. I mean, it existed. And if it existed, then it seems to me that there is a good reason for Louisiana to have followed it. I think that's exactly right, Justice Jackson, and that's why – that may well be the Unicorn case, the Unicorn case that says, you know, black is green. Nobody, like, objectively agrees with that, but that case may also never arise. Let me ask you about substantially addressed the violation. Was that something that the district court addressed in this case? I didn't see that as part of its analysis, and isn't that another basis for finding error here? It did not, Your Honor, and yes, that is an independent legal ground for finding error. And that's why I pointed the court to, if you look at pages 53A to 66A of our JS appendix, that's the good reasons analysis, and you see nothing about Robinson there. You see nothing about the Robinson illustrative maps. With all due respect, that factual background is what explains SB 8, and so you can't assess the legality of our map without referring as a baseline to the comparison against the Robinson litigation. Thank you. Thank you, Counsel. Mr. Nafee? Mr. Chief Justice, and may it please the Court, this Court has been clear that states have breathing room to take reasonable efforts to comply with the Voting Rights Act, and they may also balance the many other interests that enter the redistricting calculus. And so it was perfectly appropriate, after two federal courts had found that Louisiana had likely violated Section 2, that the state sought to comply with those rulings, and that it exercised its authority to protect favored incumbents and unite preferred communities of interest. And accounting for those kinds of political considerations is squarely the legislature's prerogative. And breathing room ensures that courts don't unnecessarily intrude on the legislative domain, simply because the state is attempting to comply with the Voting Rights Act. But the district court did exactly that in finding that the state's chosen remedy for the violation shown in Robinson was unconstitutional, and it committed three errors in doing so. First, it treated the intent to comply with the Voting Rights Act as inherently suspect. Second, it dismissed Robinson as a good reason for the state to engage in remedial districting. And third, it demanded that the state's chosen remedy maximize compactness and compliance with traditional redistricting principles, even when that precluded the state achieving its political objectives. Those errors denied the state the flexibility to make political judgments, balance competing interests, and comply with federal law. And so we ask the court to reverse the decision below, and I welcome the court's questions. Could you take a minute or so and describe exactly what the underlying Voting Rights Act violation was? Absolutely, Your Honor. And how it was remedied. Yes, the district court in the Robinson case looked at the history, looked at the history of discrimination, looked at modern instances of discrimination. It found that there were extreme disparities in the black communities in the region around Baton Rouge and to St. Landry Parish and into other parishes, also in the Delta region, which was drawn into our illustrative maps. So it looked at that history. It found that based on that, those conditions, current conditions, not just history, but current conditions, that black voters in Louisiana had less opportunity to elect candidates of choice than other voters. And so it looked at the totality of the circumstances. It found that there was a compact map could be drawn and that race did not predominate in the illustrative maps. And, therefore, it found, and it looked at the polarization, and it found that Section 2 had likely been violated. Counsel, what do we do about the fact that Robinson 1 was just litigated through a preliminary injunction? And I understand that the court has suggested that there's a compelling interest in abiding Section 2, but here we don't have a final judgment, and that's a little awkward to say that a preliminary injunction, which even in the existing litigation, has no binding effect going forward, right? I mean, you get a P.I., you can lose on the merits. It happens all the time, right? So what do we do about that? Well, I think first, Your Honor, this court has found good reasons on much less than that. It's found good reasons based on, you know, legislature's analysis of past election results on demographics of districts and turnouts. No, I understand that, but here it's based on a court action. But the court action was preliminary. It was preliminary in a very formal sense, but the record in Robinson was very robust. It was a five-day evidentiary hearing. The court heard from 21 witnesses. There were hundreds of exhibits. And the court made a reasoned decision based on that record, and not only was it the district court's decision, but that decision was then affirmed by the Fifth Circuit with the benefit of this court's decision in Milligan that found that the district court had correctly identified a likely violation of Section 2. And so under any circumstances, you know, under this court's precedent, that's more than enough to find good reasons for the state to engage in remedial redistricting. Well, it was not only a preliminary injunction. It was a preliminary injunction that was vacated by the Fifth Circuit because there was no longer any irreparable harm at the time when the Fifth Circuit decided the appeal. And the Fifth Circuit said, you know, we're not convinced that this is the right result. This will be the right result in the end. Isn't all that true? Well, not all of it, Your Honor. First, the Fifth Circuit said that the harm is still present, so it was the balance of the equities really that it was the basis for vacating the injunction. And you can see that in the Fifth Circuit. All right, but it's a vacated preliminary injunction. It's vacated, yes, Your Honor, on the balance of the equities, but the Fifth Circuit very clearly affirmed the merits of the district court's decision, its determination that the plaintiffs were likely to prevail on the merits. Why is this situation different from the situation in Miller, which I don't think you discuss in your brief, where the state said we adopted this map because that was required to get preclearance from the Justice Department, and the court just blew right past that. So what's the difference? I think there's a very big difference, Your Honor, between the Justice Department making a pre-litigation assessment about what Section 5 requires, which in Miller the court made clear would be subject to judicial oversight, and an Article III court in an adversarial setting looking at the evidence and making a determination that Section 2 has likely been violated. Well, I come back then to the question I asked Mr. Aguinaldo. What if the underlying decision, what if the district court decision is wrong? What if you read it and you say this is wrong? It applied the wrong standard. Well, I think, Your Honor, if there were some unusual circumstance like that, and then you'd also maybe want to look at why did the state not defend it if it was so wrong. You know, unusual circumstances like collusion, like a responsible official's failure to defend a map, which does happen from time to time. Then you might look with more skepticism at the decision. Well, why isn't this a situation where if you look at the face of the decision, it's wrong? And you just summarized what the middle district judge held, and it was wrong. Under LULAC, it's wrong. The question is whether there is a minority population that is sufficiently compact to be included in a district that sufficiently respects traditional districting lines, not whether once you've identified bits of minority population, it is possible to draw a district that's compact. That's contrary to what LULAC said, but that's what the middle district said, and it's what you just said in summarizing what they held. Well, absolutely, Your Honor. The standard is, is the minority population sufficiently compact to form the majority in a reasonably configured district. We said that in Allen, didn't we? That was pretty recent. That was last year, two years ago. Absolutely, Your Honor. We said it in Wisconsin legislature. Sufficiently large and compact to constitute a majority in a reasonably configured district. That's exactly what they did. I mean, LULAC has some language. It actually goes back and forth between the two, but we've repeated now several times, including in our most recent decision, the standard that was used here. Absolutely, Your Honor, and the way that standard is typically applied is that if there is a reasonably configured district that is majority-minority, that's the evidence that the minority population is sufficiently compact. I mean, if you look at CD6, what does reasonably compact mean? I mean, it's a snake that runs from one end of the state to the other. I mean, how is that compact? Well, absolutely, Your Honor. So CD6 is the remedial district. That was not offered as an illustrative district to prove a Section 2 violation, and states have flexibility when they are drawing remedial districts that a plaintiff in a Section 2 case might not have. We can't draw non-compact districts to prove the Section 2 violation, but once we have shown that... So in Robinson, they were looking at a totally normal-looking district, right? It was a much... Kind of square, and it's like there's nothing unusual about it. It actually looks like the district that the state went in with, right? Absolutely. It's very similar to the states, the CD5 and the original map enacted in 2022. And so that's the evidence... It performed better on traditional criteria. The Robinson map performed better on traditional criteria than Louisiana's map, correct? Yes, that is correct. So what do we do about that? You came up with some compact maps. Louisiana chose a snake, as the Chief Justice called it, instead, squiggling from one end of the state to the other. Even if there were good reason for the district court, for equal protection purposes, the state had good reason to draw another district, did it have good reason to draw this district? Well, it had good reason to believe that it had to draw some remedial district. We're moving past the preliminary injunction stuff, whether they had good reason. I'm asking, is this one narrowly tailored? Is this one the appropriate district? Yes. So the question the court asks there is, does the district that the state drew, the remedial district, substantially address the violation? And that's my question for you. And so here, as Mr. Aguiñaga explained, the district includes a substantial part of the same population. The core of the district is identical to the districts that were at issue in Robinson, to our illustrative districts. It's about at least 70% of the population. But geographically, it's wildly different. And so what do we do about that? Well, I think the geography is not really the issue, because as this court pointed out back in the 60s in Reynolds v. Sims, legislators represent people. They don't represent geography. Yeah, but districting is supposed to take into account. I mean, we're going to go around the tree, I suppose, but districting is also supposed to take into account compactness and contiguity, sorry, and traditional districting principles. And this one, you didn't propose this district. No, we did not propose this district, but we believe the district remedies the violation because it includes most of the population from the illustrative districts. And states are not constrained. This court has said repeatedly that states don't have to draw the compact districts that a court would impose. They can take other considerations into account, including political ones. And I'm wondering whether or not we're conflating the standards in a way as we have this conversation. I mean, the original Section 2 violation was established via the map that was compact that you created that showed that another majority-minority district could be drawn. And in response to that, the state, for political reasons, said we're not going to adopt that map. We need to make a different one in order to reach the goal of remedying this violation because of political reasons. So at that point, I'm wondering whether we are even in a world in which strict scrutiny is applying because the state's motivation for drawing the squiggly snake map is not race. Its motivation at that point is clearly politics because that's what it's saying it's doing, choosing that map over the one that you proposed. So do we even need to get into the analysis about narrow tailoring because it seems we've left it because we're now in the world of political map drawing, right? Absolutely, Your Honor. And the line this court has long drawn is between consciousness of race and racial predominance. And that distinction is important to preserving states' flexibility to account for these kinds of political considerations while also complying with federal law. And what I hear you saying is the reason why we're looking at a snake-like map rather than the compact map is because of political considerations. Politics is the only reason that the state chose that map over the compact maps that were offered in Robinson. Counsel, you said what's important on compactness is where the core of this district is. Well, it's not a question of compactness, Your Honor. It's a question of remedy. Does it remedy the violation that had been shown? This court has never said that states are required to draw compact districts. There's no obligation to draw compact districts if they're not doing it for, you know, if they're not drawing a non-compact district predominantly based on race without an adequate justification. So they can draw compact districts, non-compact districts as a remedy once a violation has been shown. And you think the drawing of this district was not predominantly based on race? I think that— I mean, it runs from one side of the state angling up to the other, picking up black populations as it goes along. Well, Your Honor, that was the plaintiff's position. But as the state identified interests, communities of interest that it had joined in that district, in that shape, and if you look at the historian, the Louisiana historian's amicus brief, they explain that it's not by chance that there are significant black populations in that corridor along the Red River. It's a result of history. It's a result of the history of slavery, of Jim Crow, and of the disparities that prevented the lack of economic opportunities that kept people there over generations. And so those ties are still there throughout the district. There are family ties. There are community ties. There are religious ties among those communities that are drawn together in that district. And that's part of what the state identified, what the legislature identified, was the interest that they were drawing together in addition to the political reasons. So it's not a district that randomly draws together pockets of black population. The point that the Chief is trying to get at is certainly politics played a role in this district, but didn't race? Absolutely, Your Honor. The state was trying to draw a district that would remedy the violation that we had shown. Which is another way of saying race predominated. Well, I would disagree with that, Your Honor. I think that means race was one consideration, and this Court has long said in case that... I'm sorry. I'm sorry, Chief. No, no, go ahead. Isn't saying race is one consideration another way of saying race predominated? And how do we square that with the 14th Amendment's promise that race should play no role in our laws? Well, in the redistricting context, this Court has long recognized that legislators are always aware of race. And the fact that race was one thing they were considering when they drew the map does not mean it was the predominant thing. It means that it was one of many considerations that they had. Politics was another. Communities of interest was another. And without some evidence that would disentangle those things and show that, well, actually race, among all of those considerations the state was considering, race was the one that actually drove the lines. Race does not... The plaintiffs have not borne their burden to prove that racial predominance. Thank you, counsel. Justice Thomas? In some of these redistricting cases, the argument is that a certain percentage of the black population is excluded. And you redraw the map to include that population. And what I'm interested in here is exactly what the violation was and exactly how this map solves that or addresses that violation. So the violation was that the map adopted in 2022 dilutes the votes of black Louisianians by denying them an equal opportunity to elect candidates of choice. And the way we showed that was through drawing illustrative districts and included this common core of seven parishes in the center of the state and connecting that with populations in the Delta, which was a similar configuration to the state's map. So ours was sort of a least change map that would remedy the dilution. The state included that same core and it drew together other different black populations in the district to create a remedial district that would remedy the dilution. And I think in that sense, this case is most like Abbott. In Abbott, the Texas court had held that there was a Voting Rights Act violation and the state needed to add additional majority-minority districts. The way the state did that was that it drew together some voters in that southwest Texas area where the violation had been proven with other voters in a different part of the state. And this court said that was fine. They did it for incumbent protection purposes. The fact that it was the least compact district in the state was not even part of the analysis because the state had the flexibility to remedy that violation in a way that also advances political goals. Justice Alito? Let me ask you a question about illustrative District 5. That was before the Middle District of Louisiana and the Robinson case. So that district combined black populations near Baton Rouge and Lafayette in the southeast region of the state with splotches of black populations near Monroe, Bastrop, and Tallulah in the far northeast corner of the state. Now how can the failure to combine these far distant populations in a map, in a single district, be regarded as the cracking of a concentration of black voters? Well, the district court recognized that our illustrative maps were more compact, split fewer parishes than the state's map in creating a new district. The maps scored well on those criteria, but how can that be regarded as cracking? Those populations, the way the effects test under Section 2 works, and again, those determinations were made in the Middle District in litigation that the state chose not to appeal. So those have not been part of this litigation. But to answer your question, the way the effects test works is it looks at the way the map is drawn and whether it could be drawn differently so that it would not have those impacts. I understand that. Not only are these populations distant from each other, isn't it the case that they differ in some fundamental respects and therefore may not be part of the same community of interest? The concentration near Baton Rouge and Lafayette are people who live in urban areas. The people who are way up in the northeast part of the state live in rural areas, small towns. Their values may be quite different, much more religious perhaps than the people down in the other part of the state. Isn't that true? And just one last question. Doesn't voting in the 2024 election substantiate that? Your Honor, the district court looked at the evidence of the shared interests. The district court in Robinson looked at the evidence of the shared interests among these communities that were drawn together in our illustrative districts. That was part of the evidence that we put on. The court heard testimony from lay witnesses. The court heard testimony from expert witnesses about how they identified those shared interests and how they drew the maps. And so the court made a determination that there were shared interests among the black voters that were in that district and that they would be advanced by having an opportunity to elect a candidate of choice. All right, thank you. Justice Sotomayor? The problem I see is that Louisiana's original 2022 map does exactly what Justice Alito is saying, is joining together white voters who don't necessarily have shared interests. Well, Your Honor, it is a similar configuration. It does extend from the Florida parishes in the southeast and then wrap around the ankle of the boot and head up to the delta. So it's a very similar configuration. That's the point, which is what you've done is tie together communities of interest in a different way, correct? Absolutely, Your Honor. And one that complies with Section 2 but keeps your political needs. Exactly, Your Honor. And that's what the district court in Robinson found. Not your political needs, but Louisiana's political needs. Thank you. Justice Kagan? If I understand the question a couple of my colleagues are asking about, it really was Robinson right, not was the decision below right. And as to whether Robinson was right, do you think that we're well positioned in this case to address that issue? I do not, Your Honor. The Robinson decisions were appealed to the Fifth Circuit. Six different Fifth Circuit judges. Yes, there was a state panel that looked at the merits and found that the state was not likely to prevail in the appeal, and then that was borne out by the merits panel that agreed that the district court had correctly found. We had the opportunity to do something about it at one point. We let it go. Six circuit court judges. As I understand the respondents' argument in this case, the respondents are not standing here. I mean, they might think Robinson was wrong, but their brief is not premised on the idea that Robinson was wrong. Is that correct? That is absolutely correct, Your Honor. The merits of the Robinson decision have not really been part of this litigation at all. Yeah, and the general here was saying, you know, look, they litigated Robinson a lot. They took it to the Fifth Circuit twice. They litigated it a lot, and like at some point, a state takes its loss and decides that it has to get on with things, and that's exactly what the state here did. Absolutely, Your Honor. The state was not in a position to simply ignore the Robinson rulings. It was not in a position to draw another map that would dilute the votes of the black Louisianians whose rights had been violated. And that's a reasonable thing. I mean, we say all the time states have to have breathing room. States have to have breathing room. This state used its breathing room to say, after we litigated this and then we litigated this again, and we knew we were going to lose because six Fifth Circuit judges had told us so. It was time to get on with things and draw our map that served our political objectives.  That's exactly what breathing room provides, that kind of ability for states to take those political calculations into account. Thank you. Justice Gorsuch. Justice Kavanaugh. Two questions. One, a general equal protection question, and then a more specific Section 2k question. On equal protection law, we've, of course, said and the courts long said that race-based remedial action must have a logical end point, must be limited in time, must be a temporary matter, of course, in school desegregation and university admissions. How does that principle apply to Section 2? Your Honor, I think that Section 2, as it has been applied through jingles, is tied to current conditions. It requires a totality of the circumstances analysis that looks at current conditions. It looks at racially polarized voting today. It looks at examples of discrimination today. So it's tied to current conditions, and there doesn't need to be an artificial time limit on how Section 2 would apply, because it's always applied based on current conditions. Second, on the specific questions here, on the race politics, I just want to disaggregate this. My understanding of your position is that the reason that there's a second majority-minority district required is because of race, because of Section 2. But the choice between which majority-minority district to use was made entirely on politics. Is that your position? Yes, that is our position. Thank you. Ms. Spirit? So is your understanding of breathing room—I just want to be sure I understand your answers to Justice Kagan— is your answer to Justice Kagan, your understanding of what breathing room allows a state to do, necessarily mean that any time there's a district court order finding a Section 2 violation, that is reason for a 14th Amendment claim to then later lose? Because compliance with Section 2 would always be a reason for the state to draw a race-based district. Your Honor, absent some unusual circumstance like collusion, a decision by an Article III judge provides about the best reasons that a state can have for thinking it faces Voting Rights Act liability. It's been adjudicated to have likely violated the Voting Rights Act. And this Court has said good reasons means that the state has good reasons to believe it faces Voting Rights Act liability. So yes, I would say that when there is an Article III judge's determination, in this case affirmed by the Fifth Circuit, that's about the best reasons this Court has recognized as requiring remedial action. So let me follow up then on Justice Kavanaugh's question. He pointed out there's two steps here. One, he had to draw a second district based on race, but the shape of that second district was based on political considerations. What if that wasn't the case? What if they didn't like the one imposed by the Robinson map, your map, and said we're going to draw a different one, but expressly said the whole time, didn't talk about the speaker, didn't talk about anyone else, didn't talk about politics, just said we're doing this because of race, we don't like that other map, race, race, race. So the shape of it was also based on race. It was just different than the other ones. Well, I think part of the strict scrutiny analysis is that you have to look at was race used in a way that wasn't necessary to comply with Section 2. So if they used race and they packed black voters in the district because they wanted to use that as a proxy for, or as a pretext for doing partisanship through race, that might render it invalid. So that would be an example where you couldn't just point to the earlier Section 2 litigation as the compelling interest. No, Your Honor. Well, it is the compelling interest. The question is, in remedying the violation, did they use race in a way that wasn't necessary to remedy the violation and they used it for some other illegitimate purpose. Justice Jackson. Yeah, just to follow up on Justice Barrett's point. Your point is just that the previous litigation provides the compelling interest, a good reason to go forward, but there's still always the narrow tailoring and we're looking at what it is the state is actually doing with respect to its remedy, right? Yes, absolutely. Has the court ever held that race predominates whenever a state draws a district to comply with Section 2? I thought we suggested the opposite in Chavez-Reno. This court has not held that. The court has expressly said that intentional creation of a minority district does not on its own prove racial predominance. The court said that in Bush v. Vera and then in Bethune-Hill, the court refused to find predominance even where the state had a 55% target. That was just one consideration in the predominance analysis. It wasn't the whole analysis. And is it the plaintiff's burden to disentangle race from politics in a case like this? Yes, of course. It's the plaintiff's burden at the first stage on predominance. Thank you. Thank you, counsel. Mr. Grime. Mr. Chief Justice, and may it please the court, with one exception that we'll get to in a moment, there is nothing new or extraordinary in the fact pattern presented by this case. This is Shaw II again. This is Miller again. This is Bush v. Vera again. This is a case that was drawn from the very beginning of this court's racial gerrymandering jurisprudence. It was born in an era where states were drawing majority-minority districts allegedly in order to comply with the VRA, whether it was DOJ pressure under Section 5 or fear of Section 2 liability. In Shaw II, the District 12, the unusual district in North Carolina, was not drawn where DOJ wanted the second district to be drawn. It was drawn there to protect Democratic incumbents. In each of these cases, the state always says it wants to protect incumbents. And that's why its district is not quite the same as DOJ wants or as the plaintiffs in Section 2 want. So there's nothing new about that in this case. What the appellants claim is new is Robinson, but Robinson was not a final decision. And we can avoid all the problem about how final it was or how convincing it was by simply asking the defendant on strict scrutiny to bring this mountain of great evidence into the court and show why there's a strong basis in evidence for drawing a second district and to show why it's narrowly tailored. But ultimately, they didn't do that here because the decision is badly flawed and because the district judge in Robinson at page 834 looked at the original Hayes-Slash map, which is so close to this map, and said that the districts there were diffuse and nonsensical. And so that's why it never came up, and that's our problem here. I'm happy to answer questions. Do we have to accept Robinson, which is not on appeal here, as a given? Justice Thomas, we don't have to. Instead, we should have looked to the defendants to bring out the parts in district court about Robinson that they thought were so compelling, and they never did. They actually tried to block any discussion of section 2 at the district court level. I'm sorry. They have a decision by a lower court that they're likely to succeed. They have an appeal of a temporary restraining order where that court says they're likely to win. And we have a merits panel who looks at it and says they're likely to win. They can't – that's not enough to provide a good faith basis for believing that they need to comply with section 2. That's what you're saying. Well, there's two answers to that. First of all, if they did believe that, the answer, so that we wouldn't have to speculate here, would be bring the evidence to the three-judge district court. Why did they have to do that? Meaning what you're asking for is a re-litigation of Robinson in total. But it's not whether they were right or wrong. We've said that. Good faith doesn't mean that you're proving that you had to do this. It's just whether you had a good faith basis to believe you should do it. But in Wisconsin legislature, this court said that the breathing room is for reasonable mistakes in the data. But you have to make your showing. You have to make your showing. We'll go back to that. Thank you. Well, counsel, can I just ask you, because some of the things that you've said makes it seem as though you're suggesting that Louisiana's pointing to the court order was pretextual. In other words, you say if they believed that the court was ordering them. So do you have some basis for disputing what Governor Landry said? We are here today because the federal courts have ordered us to perform our job. We have exhausted all legal remedies, and we have labored with this issue for too long, and that's why we're drawing the map. I mean, do you concede that Louisiana at least sincerely believed that the courts were requiring it to do this? Well, I think I would simply point to the litigating position of Louisiana throughout the case, including just a few minutes ago. I mean, in their heart of hearts, they don't believe the VRA requires this. No, I understand. They thought the courts were wrong, but the question is, did they believe that a court was ordering them to do it? I mean, I am sort of concerned about your view as seemingly expressed, and I want you to clarify it, that a court order compelling you to do something is not a good reason for you to do it. Justice Jackson, I'll just fall back on General Merrill's comments to the legislature, making clear that the state was not under a court order at the time. Instead, the Fifth Circuit said you can either go back and defend this district without using your Allen v. Milligan-style theories, and actually put in evidence on the jingles factors, which they hadn't done, or you can go draw a VRA-compliant map. They were not ordered to simply go draw a map. That goes to the remedy. I'm asking about the violation. We had many judges, as other justices have set forward, that looked at the actual merits of the question of whether or not there would be a VRA violation if a new map wasn't drawn. So Louisiana felt, I think they're saying, compelled to do something about this. And you seem to be questioning whether or not they were, and I'm just trying to clarify that. Well, at the end of the day, we do have to take Louisiana at their word. But I just want to be clear, they were given a choice to actually go in and raise a defense. And I think reading Robinson makes this clear. The court says time and again, Louisiana, you raised the Alabama arguments from Allen v. Milligan. You try to use experts to show that jingles one was violated because of the intent of the illustrative map drawers. But you never put in actual evidence on the types of factors that Justice Alito was talking about. I guess I don't understand, Mr. Grime, what should Louisiana have done? Louisiana litigated this case. It lost in the district court. It lost twice in the circuit court. You know, if I read the list of the judges, I'm just going to tell you, but if you lose those judges, you're going to lose. We had no interest in taking the case. It was brought to us. We said no. What was Louisiana supposed to do? Well, I think in this case, the Fifth Circuit laid out the options. I mean, first of all, Louisiana had no reason to think. The same illustrious list of judges pointed out that you can start over again. You can retool and maybe don't use Allen v. Milligan as the roadmap this time. That hint was clearly given to the state. I guess I get the idea that it did have the option to keep on finding ways to litigate this question. But there were ways that it could have refused to give up. I take that point. But at some point it said, you know, we've been told we're wrong by seven judges. And we're going to accept that. And we're going to move on and find a map. And then the state lawyers come in. And I mean, the record is like the state lawyer says there can be no better reasons to believe that the VRA required a second-majority black district than a precedential opinion of the Fifth Circuit asserting that a map with a single-majority black district likely violated Section 2. And the state lawyer talks about all the process that they went through and the hearing that they had and the maps that were submitted. And she says, what better reason could there be for this? So like at a certain point, like I get that there might have been other options. But that's the whole point about breathing room, right? Breathing room is states have choices. And this was one state that decided on this choice that you don't agree with. But it was like well, well, well within the parameters of like a good-faith reasonable choice. Justice Kagan, if that were true, then what the state should have done is brought that before the district court. What the state argued in the district court was is that Robinson's mere existence was dispositive, that we were essentially stopped from even bringing our claim for that reason. And so if the evidence was so compelling in Robinson, all they had to do was use their trial time. They didn't even use all their trial time and show us the key points. Mr. Counsel, if we're going to defer to the Fifth Circuit, they also found a constitutional violation here too. So speaking out of all sides of all mouths down there, and I'm not sure that's how the system works anyway. But I have a question for you on the remedy. Your friends on the other side say, okay, race predominated in creating a second district. But race didn't play a role in the squiggly line district. It was politics. And I want to get your response to that. Sure. There are two responses, Justice Gorsuch. First of all, Senator Womack, in his presentation, he's the sponsor of the bill, said there is just not enough black voter population in southeast Louisiana. And he says that is why the district is drawn up to Shreveport, up I-49 and up the Red River to Shreveport. So the sponsors were very clear that that's what they were doing. So you can look at the evidence. But the other issue is this. The only reason that politics began to matter at this level was because they accepted that there had to be a second black majority district. That then caused the problem of losing an incumbent and having to choose who was going to be lost. What does it mean to say race or politics predominate? I mean, I thought the 14th Amendment said we don't look at race. Predominate says you can't up to a point. But I don't know what that point would be. And I don't know, can two things predominate? Can politics and race predominate? I don't know. Justice Gorsuch, that may be a problem in some racial gerrymandering cases. It's not a problem here, though, because everyone admits that step one of the process, in fact, the state admits in its briefing the baseline was to draw a second black majority district. Everything else that happened, you know, flowed from that. And that's enough under Bethune-Hill, under Cooper, under several of the court's cases. That's enough for predominance? Justice Gorsuch, we have a case that says that if you are drawing a second or a third or whatever black minority district, you satisfy the racial predominance? What I was quoting was that the standard for predominance is the initial decision that couldn't be compromised. And actually just last... I'm sorry, then there's no way to comply with Section 2. If what you're saying is you can never, a state could never in good faith redraw a map if it believes that it's going to draw a map that is going to solve a Section 2 violation. That's what you're saying. No, Justice Sotomayor. So this is a cycle they can't get out of. No, Justice Sotomayor, they would then show on strict scrutiny a strong basis in evidence for drawing that map. But that's what they've done here. They've got a judge saying, you've violated it. There's an alternative map that meets all traditional criteria. Go draw your own map, but make sure you get a second out because that's the only way to remedy this violation. And they come up with a second map or a different map that they show is based purely on politics. They wanted to save three incumbents, so they drew lines to save three incumbents. Justice Sotomayor, I think it is helpful to look at the remedial map. I mean, first of all, Senator Womack stated that it was for the purpose of capturing additional black voters that it was drawn that way. But we can skip a lot of the difficult issues that have been raised here by going to one point, and that point is from Shaw too, from Miller, and from Bush, and actually in LULAC as well, which is that you can never have a Section 2 remedial map that fails Jingles 1, that is not geographically compact and does not comply with traditional redistricting criteria, and that's what the district court found here as a matter of fact. We have a factual finding from the district court on that point. Their answer to that, I think, is the 70 percent, so can you just address that? Sure. So the 70 percent does not trump the geographical compactness requirement. I will address that, but I want to make very clear that no matter what, even if you've covered a lot of the old population, you can't draw a non-compact remedial district, and that decides the case. But the other problem is this. First of all, I think the correct number is something like 67 percent, we looked, but it's over half of the population, and that really matters when you're looking at Jingles, because remember, Jingles hinges on some very fine calculations, and when you lop off 100,000 black voters in 14 parishes, you have to find 100,000 new black voters in another area of the state, you can't just assume that that's substantially related. The 20 percent issue also, if you go back and look at SHA-2, the 20 percent they're talking about is Mecklenburg County. They're talking about the black voter core of that county. The court's referring to 20 percent of the area of that District 12, and we couldn't tell, we looked for this. It likely was a much higher percentage of the black voter population of District 12, but it's not in the record, and I've not been able to figure it out. Counsel, speaking of the record, I have to point to what the appellants point to on page 18 of their brief. This is the state's brief. When they talk about Senator Womack, you've mentioned him several times, and apparently he was asked directly what was the predominant reason for you to create the 6th District this way, the way it looks now, versus just going with Senator Price's bill, which created a more compact district, and he answered it was strictly politics. Politics drove this map because of the Speaker Johnson, Majority Leader Scalise, and my Congresswoman, Julia Letlow. Predominantly drove this map, and he disavowed that race was the predominant factor. You've said exactly the opposite several times here, so can we just get some clarity on what Womack's position was? Sure. First of all, Senator Womack said a lot of things. What I quoted from Senator Womack was accurate, but what Senator Womack was doing was distinguishing between the Robinson maps, or what everyone presumed them to be, and the new district. The problem, though, is that this court has never said that there is a second intent analysis done on strict scrutiny. In fact, Justice Kennedy, specifically in Bush v. Vera, said, in response to Justice O'Connor suggesting that that could be the standard, said we've never recognized that, and no case from this court ever happened. Let me put it this way. If Louisiana had accepted the initial Robinson map, would you have brought your litigation, would you have been able to make the argument that this was not compact, this was somehow a violation, or what would your position have been? Well, we don't have all the facts in front of us, but we would have scrutinized it, and if the record had been what it was in Robinson so far, we absolutely would have brought the case. And then they would have come into our case and said, well, you know, we think it's compact. You know, we only looked at plan-wide compactness, and that's why we won. I mean, I think we would have prevailed, but... I guess I don't quite understand the role compactness plays in your analysis, because, and this goes back to Justice Kavanaugh's point that it's really sort of two steps. I mean, once Robinson has provided Louisiana with a good reason to think that there was a Section 2 violation that they needed to remedy by creating another minority district, once that happened, what Louisiana did was, like, look at this map and say, essentially, we have three incumbents, and we know which two are really important for the state to keep. And they created a map that made sure that they kept the two incumbents that were most important for the state to keep. And, like, why isn't that, like, completely within the prerogative of a state? That has nothing to do, I mean, it creates a less compact district, no doubt about that, but, you know, we've never said to states, oh, you've got to go with compactness when the Speaker of the House is going to be thrown out. I mean, it's totally within the prerogative of the state to say incumbent protection and particular incumbents are really super important to us. Two responses, Justice Kagan. First of all, we're in strict scrutiny at this point. I mean, the state has racially gerrymandered black and white voters. Look, there's, like, two steps here. One is, is there good reason to think there's a Section 2 violation? Robinson has created the premise of thinking that there's good reason, that you need to create another map. Now the question is, what does that map look like? It's the remedial question. It's the, does the map substantially address the Section 2 violation that you have good reason to think exists? And the state said, you know, the plaintiffs have presented these maps that would substantially address that. We have a better map that would substantially address that, that also allows us to keep our incumbent better because it allows us to keep our incumbents. I mean, what's wrong with that? If the state can't do that, the state has no breathing room. Well, first of all, we disagree with the first premise of the question, but here's, I think, where the problem is. This court is going to have to overrule Shaw 2 and Miller if it holds that you don't have to draw a geographically compact remedial district because the court in Shaw 2 said, looking at District 12, there's no way we can find that there is a geographically compact population of any population of that district, and that is why, that's why they lost in Shaw. I think this is a little bit backwards, Mr. Grine, because you will only get to evaluate CD6 if we find that there was good reason to think that there was a substantial likelihood of a voting rights violation. So that good reason is provided by Robinson, and Robinson says that there's a compact minority population whose Section 2 rights are likely being violated. Once Robinson says that, the question only becomes whether CD6 substantially addresses that Section 2 violation. But the compactness inquiry, which is, you know, is there a compact district such that Section 2 is being violated, that happens at the first step of the analysis, and Robinson has already addressed that question. Well, but unfortunately, Robinson is addressing a different area of the state, and that's the problem. That's why compactness is a backstop. The other problem is this. In states where you are reading out the very last elements of black voting population, it's inevitable that whatever the gerrymander is that's finally drawn is probably going to have some fair slice of what was in the original maps. That's why if you only focus on overlap, you're missing the key issue from Shaw to and from Miller, which is that you have to have a geographically compact remedial district full stop. And that's the backstop that keeps us from having to draw lines and figure out how much of Mecklenburg County was really in each district and whether 67% and over half the territory is enough. And again, it matters because these are jingles districts, and all we know is the average for the whole district. We don't even know that the section we're gathering combines with the new voters to satisfy jingles. Maybe I'm missing the thrust of the question, but the question seems to be, is it not the case that if you grant the premise, then at the remedial phase, anything goes? Now, can that possibly be correct? Suppose that the district that's created is not the parts of this district are not even connected. You've got an island here, an island there, an island here, an island there. Would that be okay? Absolutely not, and that's the problem. Mr. Griman, it is not an anything goes inquiry. We've said it has to substantially address the voting rights population. So, for example, where there was a remedial district that addressed only 20% of the people whose rights were actually violated, we, of course, struck that down. But here, the district addressed 70% of the people whose rights were being violated, which seems like a ways different from 20% and seems to suggest that the voting rights violation was being substantially addressed, which is the only thing we've ever required at that point. Well, actually, Justice Kagan, in Shaw 2, the court says that the remedial district must be compact. It must hold a geographically compact population. And, you know, why not just take Shreveport, skip the intermediate territory and not have it be contiguous and add that to what is claimed to be the core of this district? Now, again, it was the state's burden to show this in the district court. This argument was never raised in the district court. There was no evidence whatsoever in the record about how many of the people from the original district were in there and whether by combining them with the new populations, we have anything that looks like a jingles district. Because, again, their entire argument was the mere existence of Robinson completely satisfies strict scrutiny. That cannot be correct. Your lead argument in the brief for why there was no compelling interest here in the race-based redistricting on page 36 was the durational point, the Constitution. The authority of a state to engage in race-based redistricting must have an end point. You haven't mentioned that so far. The other side said that that argument's been forfeited, and I want to get your response to that. The fact that you haven't mentioned it so far certainly supports what they're saying on that, but I'll give you a chance to respond. Sure. I mean, the problem with this case is that we think the appellees win many different ways, and this is an argument we're making on the side of the case that is the state's burden. And so I don't think the law supports that it's our duty to anticipate, you know, second or third or fourth reasons why they'll fail under strict scrutiny and make sure we raise them below. And so I don't think the argument was ours to forfeit. I guess I can put it that way. But the problem is this. If you go back to Robinson, the evidence on current racial context in Louisiana that still requires this purely effect-based test was very thin. They could have actually, in fact, they would have had to have raised that in the district court below, but they never did do that. Again, they didn't bring in any jingles evidence, let alone the kind of evidence that would say if you look around Louisiana, there are still a lot of barriers to black citizens voting. So that's not on the record. I think there's a reason for that, and I think that shows us that Section 2 is no longer performing the function that it was assigned, that Congress thought it was going to perform back in 1982. Now, why are we seeing so many Section 2 cases? Why are we suddenly now, as voters are becoming more integrated, why are we suddenly finding new Section 2 districts everywhere? I think that's a problem. Thank you, counsel. Justice Thomas? Justice Jackson? I just have one final question, and it's the Robinson map, the proposed Robinson map that had the black district, that would be one that might oust Julia Letlow. Is it your position that the black district drawn in that map was not sufficiently compact? Your Honor, we think if we have a chance to litigate that, which we would at the remedial phase, assuming that that's raised again, we think we'll be able to show that it's not sufficiently compact, that there are far-flung black communities in northern Louisiana and even in the Delta parishes in Lafayette that don't have very much in common with the more dense population in East Baton Rouge. I think we'll be able to show it doesn't perform as well, but not on the record. Thank you, counsel. Rebuttal, counsel? Thank you, Mr. Chief Justice. Just three brief points. First, on racial predominance. I would emphasize this Court's decision last year in Alexander where the Court emphasized caution that when a federal court says that race was a legislature's predominant purpose in drawing a district, it accuses that legislature of offensive and demeaning conduct. If that caution applies in the ordinary case, respectfully it should be especially heightened here in the case where two Article III courts are telling a state to use race to draw a second-majority district. So, Justice Jackson, we don't think the Court needs to get to strict scrutiny because race did not predominate under Alexander. Second, on the question of strict scrutiny, my friend talks a lot about Shaw and compactness, but respectfully my friend ignores footnote 9 of Shaw II. There in footnote 9 of Shaw II this Court said that even a plaintiff in a successful Section II case does not have a right to be in the ultimate remedial district that is drawn. That's because, that footnote emphasizes, a state has broad leeway to draw that district. Respectfully, there is no holding in this Court's cases that require us to satisfy jingles in drawing the remedial district as we did here. The third point is just one about next steps. With all due respect, we'd rather not be back at the podium this fall defending a new map against a new challenge. This Court's cases promise breathing room. We operated in that breathing room in drawing District 6, and if this Court holds otherwise, then respectfully, I don't know what this Court's voting cases mean. We ask you to reverse. Thank you. Thank you, Counsel. The case is submitted.